1

2

3

4

5

6

7            IN THE UNITED STATES DISTRICT COURT

8                FOR THE DISTRICT OF OREGON

9

10  RACHEL WATERS,                    )
                                      )    No.  CV 08-322-HU
11               Plaintiff,           )
                                      )
12        v.                          )
                                      )    OPINION AND ORDER
13  FRED MEYER STORES, INC.,          )
                                      )
14               Defendant.           )
    ————————————————————————————)

15

16  Kerry M.L. Smith
    Smith and Fjelstad
17  722 N. Main Avenue
    Gresham, Oregon 97030

18  Marnae H. Cunningham
    29955 S.W. Boones Ferry Road, Suite K
19  Wilsonville, Oregon 97070
         Attorneys for plaintiff

20
    Alan M. Lee
21  Francis T. Barnwell
    David H. Wilson
22  Bullard Smith Jernstedt Wilson
    1000 S.W. Broadway, Suite 1900
23  Portland, Oregon 97205

24       Attorneys for defendant

25  HUBEL, Magistrate Judge:

26  ///

27

28  OPINION AND ORDER Page 1

Plaintiff Rachel Waters brings this action against defendant Fred Meyer Stores, Inc. (Fred Meyer) for violation of Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12201 (claim one); disability discrimination under Oregon law, Or. Rev. Stat. § 659A.100 *et seq.* (claim two); common law wrongful discharge (claim three); violation of the federal Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.* (claim four) and violation of the Oregon Family Leave Act (OFLA), Or. Rev. Stat. § 659A.150 *et seq.* (claim five). Waters moves for summary judgment on her FMLA and OFLA claims, as well as on Fred Meyer's Tenth Affirmative Defense. Fred Meyer moves against each of Waters's claims.

## Factual Background

Waters worked for Fred Meyer as a clerk in the Clackamas warehouse beginning June 25, 2000. She was terminated on December 7, 2006.

Fred Meyer has an attendance policy under which employees are charged "points" for unexcused tardiness or absenteeism. When an employee's point total reaches 60, she is suspended; if it reaches 80, she is terminated.

Waters has requested and received intermittent FMLA leave on several occasions, for different medical conditions. In May 2002, she submitted an application and medical certification for intermittent leave pending the birth of her child. Suzanne Boomhower, Fred Meyer's Payroll Processor, told Waters her doctor's certification did not state medical facts necessary for

OPINION AND ORDER Page 2

intermittent leave, and that she should send a corrected certification, which Waters did. The request was allowed and the time off was not counted against Waters under the attendance policy. Taylor Declaration ¶¶ 3-4, Exhibit A.

Waters was absent between October 26 and November 4, 2004, for an upper respiratory infection. During her absence, Fred Meyer sent her FMLA leave forms, which Waters completed and submitted with a doctor's certification. The leave was allowed, and the time off was not counted against Waters under the attendance policy. Id. at ¶ 5, Exhibit B.

In 2004, Waters was diagnosed with narcolepsy. Waters dep. 83:3-5. Waters was absent from work between January 14 and January 20, 2005. She submitted an application for FMLA leave on those dates, along with a doctor's certification stating: "Patient has a condition which required her to be off work for more than 3 days." Taylor Declaration Exhibit C. On February 2, 2005, Boomhower asked Waters for the medical facts supporting her leave request, setting a deadline of February 17, 2005. On February 3, 2005, Waters submitted a statement from her doctor, Carla Bowman, M.D., showing a diagnosis of anxiety. Boomhower approved the leave and the points assessed against Waters for the absence were removed. Id. at ¶ 6, Exhibit C.

On April 18, 2005, Waters applied for one year of intermittent FMLA leave. Taylor Declaration Exhibit D. The application was supported by a certificate from Dr. Bowman stating that Waters had "narcolepsy, extreme fatigue, headache, nausea." Id. Boomhower

OPINION AND ORDER Page 3

1  approved the application, with leave beginning retroactively on
2  April 3, 2005. Id.

3      On March 10, 2006, Boomhower notified Waters that her year of
4  intermittent leave would expire on April 3, 2006, and enclosed FMLA
5  forms for completion in the event that Waters wanted additional
6  leave.[1] The letter said, "If you are still in need of an
7  Intermittent Leave of Absence, please have your doctor fill out the
8  enclosed paperwork. Be sure they indicate the reason and how often
9  each occurrence might happen and how long it could last." Taylor
10 Declaration ¶¶ 7, 8, Exhibits D, E.

11     On April 5, 2006, Waters sent Dr. Bowman the Fred Meyer
12 medical certification form that had been enclosed with the March
13 10, 2006 letter. On April 6, 2006, Dr. Bowman wrote that Waters had
14 a "chronic medical condition requiring intermittent time off work
15 and medical monitoring and testing," and that "patient may miss up
16 to 40 hours of work time per month due to this medical condition."
17 Taylor Declaration, Exhibit F.

18     Waters submitted Dr. Bowman's certificate to Fred Meyer on
19 April 24, 2006. Jenni Swan (later Taylor), who had taken over some
20 of Boomhower's duties, responded on April 26, 2006, with
21 "Employer's Response to Employee Request for Family or Medical
22 Leave," informing Waters that the certificate from Dr. Bowman was
23

24      [1]Fred Meyer's policy is to approve intermittent FMLA/OFLA
25 leave in one year increments. Boomhower dep. 26:8-17. This is
   consistent with FMLA, which provides that an employee is entitled
26 to 12 work weeks of leave for a serious health condition during
   the "12-month period selected by the employer." 29 U.S.C. §
27 2612(a)(1)(C), (D); 29 C.F.R. § 825.200(b).

28 OPINION AND ORDER Page 4

insufficient because it did not describe the medical facts supporting the request for leave. Id. at Exhibit G. In the same document, Taylor wrote that Waters was required to furnish the corrected certification by May 11, 2006, "or we will delay the commencement of your leave until the certification is submitted." Id. These statements were contained in boilerplate with blanks to be filled in as appropriate:

> You will be required to furnish medical certification of a serious health condition. You must furnish certification by _____ (insert date)(**must be at least 15 days after you are notified of this requirement)** or we will delay the commencement of your leave until the certification is submitted.

This boilerplate, with the blank filled in, had appeared on every response from Fred Meyer to a leave application from Waters: on May 31, 2002, when she requested leave for the birth of her child; on November 12, 2004, when she requested leave for an upper respiratory infection; on February 2, 2005, when she was absent for anxiety; on April 25, 2005, when she first requested intermittent leave for narcolepsy, and again on April 26, 2006. See Taylor Declaration, Exhibits A, B, C, D, G.

Waters was absent on May 5, May 15, and June 2, 2006, on each occasion informing Fred Meyer by telephone that she was missing work because of her narcolepsy and was taking medical leave. Waters Declaration, filed February 12, 2009, (doc. # 27) ¶ 6, Exhibit B (Waters I). Fred Meyer did not respond to these telephone calls. Waters Declaration, filed April 10, 2009 (doc. # 56)(Waters III). On May 11, 2006, Swan notified Waters's supervisor and others (but not Waters) that Waters had submitted paper work for a new year of

OPINION AND ORDER Page 5

intermittent leave and that if the medical certification was not turned in, absences would be assigned points until leave was approved. Smith Declaration III, Exhibit A. On May 18, 2006, Boomhower and Swan exchanged emails noting that Waters had not submitted the revised medical certification. Id. Swan sent another email to Waters's supervisors asking whether Waters had sent any leave application papers to them, and noting that her prior leave had expired in April. Swan wrote that without approved leave, absences would accumulate points. Id. On May 22 and May 24, 2006, after Waters's absences of May 5 and 15, Boomhower and Swan had another email exchange in which Swan asked if Fred Meyer should "send a 2nd request for info and let her know that points will be charged," and Boomhower responded that "we don't ask again for the info, and since I have not received an approval from you, then it is not approved." Id.

Waters states in a declaration that her narcolepsy "played a significant role in my inability to provide medical certifications to defendant in March, April, and May 200[6]." Waters Declaration II. On May 29, 2006, 18 days after Fred Meyer's May 11 deadline, Waters sent a fax to Dr. Bowman with another copy of Fred Meyer's medical certification form, requesting that Dr. Bowman supply the medical facts for which Waters sought leave. Lee Declaration, Exhibit E. Waters sent the fax from Fred Meyer, presumably while she was at work. Id.

On June 2, 2006, Dr. Bowman completed the certificate, stating that Waters had "headaches, narcolepsy and fatigue requiring

OPINION AND ORDER Page 6

intermittent time off work when conditions flare." Taylor Declaration, Exhibit H; Waters Declaration, Exhibit A. Fred Meyer received Dr. Bowman's certification on June 8, 2006. Taylor Declaration, ¶ 12. Waters submitted an application for intermittent leave on the same day, June 8, 2006, asking for leave beginning "5/06."[2] Taylor Declaration, ¶ 12, Exhibit J. Boomhower approved the request the same day Fred Meyer received it, but as stated in the April 24, 2006 letter, delayed commencement of the leave to June 7, 2006. Id.; Smith Declaration, Exhibit P. Fred Meyer assigned 60 points--20 points each--against Waters for the absences on May 5, May 15, and June 2, 2006. Taylor Declaration ¶ 13, Exhibit J. While these points appear to be sufficient to warrant suspension, it does not appear that Waters was suspended, either when the points were assessed or when intermittent leave was granted effective June 7, 2006.

Waters was 70 minutes late on September 3, 2006, 70 minutes late on September 5, and 6 minutes late on September 7, 2006. She was docked 10 points each time, which pushed her point total to 90. Waters Declaration, Exhibit B. Although normally an employee is

---

[2] Waters has taken conflicting positions on when her second period of intermittent leave for narcolepsy should have begun. In her complaint, Waters alleges, "In April, 2006, Ms. Waters sought to renew her intermittent OFLA/FMLA leave. Defendant improperly rejected the April, 2006 application for intermittent OFLA FMLA leave." ¶ 15. Waters's application for intermittent leave submitted on June 8, 2006, requests that her leave commence "5/06." Taylor Declaration Exhibit J. In her motion papers, Waters argues that her request for intermittent OFLA/FMLA leave should have commenced on May 5, 2006, the first absence from work after her previous period of intermittent leave for narcolepsy had expired.

suspended after 60 points and discharged after 80, Fred Meyer decided that, because Waters's supervisor failed to take prompt action after her total went to 60, and because her points had gone to 90 before the supervisor had imposed the suspension that was supposed to occur at 60, Waters should not be discharged; instead she was given a one-day suspension. Lettenmaier Declaration ¶ 12.

On September 15, 2006, Waters applied for intermittent family leave to care for her husband. She submitted a doctor's certificate in support of her application, and Fred Meyer approved the application for leave up to 15 hours per month from September 15, 2006 to March 15, 2007. Taylor Declaration ¶ 14, Exhibit K.

Waters called in sick on December 3 and 4, 2006. Waters states in a declaration that these absences were not for narcolepsy. Waters Declaration II ¶ 17 ("Following my absences for narcolepsy in May and June 2006, I did not miss additional time for narcolepsy between June 2006 and my termination"). See also Lettenmaier Declaration ¶ 13, Waters Declaration, Exhibit B, p. 5. These absences brought her point total back up to 80. Id. She was discharged on December 7, 2006. Lettenmaier Declaration ¶ 13.

### Standard

A party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). A genuine

OPINION AND ORDER Page 8

dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>State of California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. <u>Clicks Billiards Inc. v. Sixshooters Inc.</u>, 251 F.3d 1252, 1257 (9th Cir. 2001). The court may not make credibility determinations or weigh the evidence. <u>Lytle v. Household Mfg., Inc.</u>, 494 U.S. 545, 554-55 (1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000). Where different ultimate inferences may be drawn, summary judgment is inappropriate. <u>Sankovich v. Ins. Co. of N. Am.</u>, 638 F.2d 136, 140 (9th Cir. 1981).

## Discussion of ADA and state law disability claims

Waters asserts several claims under the ADA and state disability law: discrimination on the basis of disability, perceived disability, and "record of" disability; failure to accommodate; failure to engage in the interactive process; and retaliation. Fred Meyer contends that each of these claims fails on multiple grounds.

OPINION AND ORDER Page 9

A.   Disability discrimination

To establish a prima facie case of discrimination under Title I of the ADA, plaintiff must show that 1) she is a disabled person within the meaning of the ADA; 2) she is able to perform the essential functions of the job with or without reasonable accommodation; and 3) she suffered an adverse employment decision because of her disability. 42 U.S.C. §§ 12112(b)(5)(A) & 12111(8); Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996). The standard for establishing a prima facie case of disability discrimination under Oregon law is identical. Snead v. Metropolitan Property and Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001). In Oregon, "evidence that permits an inference of discrimination" is sufficient for a plaintiff to make a prima facie case that she was discriminated against because of her disability. Id. at 1089.

Beyond the prima facie case, the McDonnell-Douglas burden shifting analysis applies to both federal and state claims. Snead, 237 F.3d at 1092. Thus, if the employer provides a non-discriminatory reason for the adverse employment action that disclaims any reliance on the employee's disability, the plaintiff bears the burden of showing that the employer's reason for the adverse employment action was pretextual. Id. at 1093. Unless plaintiff can raise a material question of fact suggesting that defendant's explanation was a pretext for disability discrimination, she has presented no triable issue under the ADA, because at this stage her burden merges with the ultimate burden of persuading the court that she has been the victim of intentional

OPINION AND ORDER Page 10

discrimination. Id., citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

A plaintiff may succeed in showing pretext either directly, by showing that unlawful discrimination more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or by a combination of the two kinds of evidence. Snead 237 F.3d at 1094; Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1127 (9th Cir. 2000). Circumstantial evidence must be "specific" and "substantial" to create a genuine issue of material fact. Nilsson v. City of Mesa, 503 F.3d 947, 954 (9th Cir. 2007). A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is not sufficient. Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 10928 (9th Cir. 2001).

### 1. Disability

Fred Meyer's first challenge to Waters's discrimination claims is that she has not proven that she has a disability, because she has not demonstrated that she has a "physical or mental impairment" that "substantially limits one or more major life activities." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)(1). An impairment that affects, but does not substantially limit, a major life activity is not a disability under the ADA. Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999).

At the summary judgment stage, plaintiff's testimony is sufficient to establish a genuine issue of material fact regarding

OPINION AND ORDER Page 11

1  the impairment of a major life activity. See, e.g., <u>McAlindin v.</u>
2  <u>County of San Diego</u>, 192 F.3d 1226, 1235-36 (9th Cir. 1999),
3  *amended*, 201 F.3d 1211 (9th Cir. 2000).

4       In any ADA disability analysis, the first question is whether
5  the plaintiff is substantially limited in a major life activity
6  *other* than working. <u>McAlindin</u>, 192 F.3d at 1233 (emphasis added).
7  Only if there are no such limitations does the inquiry shift to
8  whether there is a substantial limitation on the plaintiff's
9  ability to work.

10      Fred Meyer cites Waters's deposition testimony as evidence
11 that she cannot identify any way in which narcolepsy substantially
12 limits her in any major life activity (she could not think of any
13 effect on speaking, breathing, hearing, seeing, thinking, sitting,
14 standing, reaching, learning, performing manual tasks, caring for
15 herself, concentrating, lifting, controlling her bowels, running,
16 or working.[3]) Although Waters testified that narcolepsy affected
17 her ability to walk, she identified only one occasion between 2004
18 and 2006 on which she had momentary paralysis of her legs
19 (cataplexy) and fell. Declaration of Alan Lee, Exhibit A (Waters
20 dep.)105:1-14. Waters also testified that she gets tired, has

21

22      [3] Although she testified that her ability to work was
    affected because she fatigues more easily than a normal person,
23  and for that reason has requested the accommodation of five eight
    hour days and no overtime instead of four ten hour days, she has
24  also stated on intermittent leave applications that she was able
    to work and perform the essential functions of her job. Taylor
25  Declaration, Exhibit D, p. 3 and Exhibit I, p. 2; Lee
    Declaration, Exhibit E, p. 3. There is no evidence that Waters
26  has ever been unable to perform all the essential functions of
    her job.
27

28 OPINION AND ORDER Page 12

headaches and nausea, once fell asleep while talking to a supervisor in 2004, and once fell asleep on the job in 2006. Id. at 106:9-13, 107:24-108:19, 121:11-122:1. She testified that she does not abruptly fall asleep, id. at 104:5-9, and that her medication "puts the fatigue at bay," id. at 109:5, and sometimes controls the nausea and headaches. Id. at 109:13-15. She sleeps "really good," but "too much." Id. at 107:10.[4]

On the basis of this evidence, Fred Meyer contends that Waters has not met her burden of proving the existence of a disability, since none of her evidence can support an inference that she is substantially limited in any major life activity.

Waters responds that she is significantly limited in the major life activities of sleeping, caring for herself, and working. She relies on her own declaration, filed February 26, 2009 (doc. # 39) (Waters II), submitted with her response to Fred Meyer's motion for summary judgment, stating as follows:

1.   Her medication relieves her symptoms "at best 20-25%." Waters Declaration ¶ 2. While her medications keep her from falling asleep during the day while she is doing something, they do not prevent her from falling asleep when she sits down for a minute. She is continually on the alert to keep from falling asleep. Id. at ¶ 13.

2.   She cannot do any job that requires her to work more than eight hours a day, or that requires her to work a shift

---

[4] Under the law of the Ninth Circuit, sleeping is considered a major life activity. McAlindin, 192 F.3d at 1333.

OPINION AND ORDER Page 13

other than the day shift. Id. at ¶ 3.

3.    If she is forced by circumstances to sleep less than seven or eight hours a night, she becomes physically ill with "severe nausea, dizziness and headaches," and will "throw up, lose my balance, and stagger." The symptoms do not decrease until she gets 11 to 12 hours of sleep. Id. at ¶ 4.

4.    She typically sleeps 11 to 12 hours per night. If she does not get this much sleep, she has "medium" nausea, headaches and dizziness. If she gets 11-12 hours of sleep, these symptoms are "light." She is always on the verge of nausea, headaches and dizziness. Id. at ¶ 5. If she gets less than 11-12 hours of sleep she must take a two or three hour nap during the day. Id. at ¶ 14.

5.    She is generally able to fall asleep quickly. After she is awake for any period of time she can fall asleep almost instantly. At times she falls asleep when it is not appropriate, such as in a social setting or in public. Id. at ¶ 6.

6.    She wakes up every night after about four hours of sleep. When she wakes up, she must get something to eat. Her regular sleeping schedule at night is to sleep four hours, get up and eat, stay awake for about 45 minutes, and then try to get another 3 to 4 hours of sleep. Id. at ¶ 7.

7.    If she is not working and she gets up to get kids to

OPINION AND ORDER Page 14

school, she goes back to sleep for two to three hours in the morning. Id. at ¶ 8.

8.    When she is working, she frequently drives to work and naps in her car before she goes in. If she works and does not sleep for 11-12 hours the night before, she naps on her breaks and/or lunch period. She typically naps during the day even if she gets 11 to 12 hours of sleep. Id. at ¶ 9.

9.    She cannot perform physical activities without sleeping. She is very limited in the physical activities she can perform. If she takes her children to the park for an hour, then she must sleep for an hour or two when she gets home; if she cleans the house or does chores for an hour or two, she must sleep for about two hours or she becomes physically ill to the point of throwing up. Id. at ¶ 10.

10.   She is drowsy every day and even with 11-12 hours of sleep has difficulty getting up in the morning. It is difficult for her to wake up, get out of bed and get going every day. Id. at ¶ 11.

11.   She is limited to one or two hours of physical activity per day, and cannot perform physical activity two days in a row. She considers "physical activity" to be any activity outside her normal daily living activities and including such things as cleaning house, doing laundry, working in the yard, going to the park, going to the zoo

OPINION AND ORDER Page 15

or engaging in any type of exercise. <u>Id.</u> at ¶ 15.

12.   Sometimes her condition becomes worse and flares up. She had a significant flare up in May and June 2006, due to medical issues affecting her husband and personal issues. The stress associated with her husband's condition worsened her symptoms. <u>Id.</u> at ¶ 17.

This testimony is sufficient to generate an issue of fact on whether Waters is significantly impaired in at least the major life activity of sleeping.

Because Waters has generated an issue of fact on whether she is significantly limited in the life activity of sleeping, Fred Meyer is not entitled to summary judgment on this element of Waters's prima facie disability discrimination case.

*2.   Discrimination based on perception of disability*

Waters concedes this claim. Fred Meyer's motion for summary judgment on this claim is granted.

*3.   Discrimination based on record of disability*

Fred Meyer moves against Waters's "record of disability" claim, arguing that to establish a "record," Waters must show 1) that her employer relied on a medical record in taking an action against her, and 2) that the record relied on shows that she has or had a disability, as opposed to a mere impairment. Fred Meyer argues that neither condition is met here.

To have a "record of" a disability "means [the employee] has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major

OPINION AND ORDER Page 16

life activities." 29 C.F.R. § 1630.2(k). Under Oregon law, the definition is essentially the same. Snead, 237 F.3d at 1089(citing Oregon cases). When an employee's records fail to reveal a level of impairment that substantially limits one or more life activities, a "record of" disability claim cannot stand. See Coons v. Secretary of U.S. Dept. of the Treasury, 383 F.3d 879, 886 (9th Cir. 2004); Walz v. Marquis Corporation, 2005 WL 758253 (D. Or. 2005). Fred Meyer argues that Waters does not have a record of disability.

I do not find Fred Meyer's argument persuasive because in Snead, 237 F.3d at 1089, the court held that physicians' notes combined with prolonged leave create at least a a genuine issue of fact regarding a record of an impairment. In Snead, the court cited an Eleventh Circuit case, Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132 (11th Cir. 1996) holding that paid and unpaid disability leave provide evidence of a record of being impaired. Waters had submitted previous medical certifications for narcolepsy and had obtained a year of intermittent leave for narcolepsy.

Fred Meyer also moves against the "record of" claim on the ground that there is no evidence that Fred Meyer took any action against Waters because of the narcolepsy shown in her medical records. Waters counters that Fred Meyer treated her narcolepsy differently from other medical conditions for which she had requested leave. She points out that in January 2005, Fred Meyer issued points to Waters when she missed work between January 14-20, 2005, for anxiety. On February 3, 2005, Waters sent in her medical documentation stating that the condition was anxiety, and on

OPINION AND ORDER Page 17

February 11, 2005, Fred Meyer removed the points and rescinded the discipline. In contrast to that, she points to the three absences in May and June 2006, which were not retroactively excused and for which the points were not rescinded, after medical documentation was submitted. Waters argues that the difference can only be accounted for by the fact that the January 2005 absence was not for narcolepsy, while the May and June 2006 absences were.

In its reply, Fred Meyer points out that the reason the points were rescinded in February 2005 and not in June 2006 is that for the 2005 leave, Waters produced her corrected medical certification within the deadline set by Fred Meyer (the deadline was February 17, 2005, and Waters produced the certification on February 2, 2005, see Taylor Declaration, Exhibit C), while in 2006 she did not produce corrected certification within the deadline set by Fred Meyer (the deadline was May 11, 2006; Waters sent a fax to her doctor from Fred Meyer's fax machine requesting the information on May 29, 2006, and Fred Meyer received it on June 8, 2006.)

Waters has rebutted this explanation with evidence that generates a question of fact on whether Waters's inability to meet the May 11, 2006 deadline was related to her narcolepsy and/or to a motive on the part of Fred Meyer to discriminate against her on the basis of the narcolepsy. Fred Meyer's motion for summary judgment on the "record of" disability claim is denied.

*4.    Able to perform essential functions of job*

The parties do not dispute that Waters was able to perform the essential functions of her job.

OPINION AND ORDER Page 18

*5.    Adverse employment action because of disability*

Fred Meyer asserts that regardless of whether Waters can show she has a disability, her disability discrimination claims fail for lack of evidence that any adverse employment action was taken against her because of that claimed disability. Fred Meyer argues that it has shown Waters was suspended and then dismissed for a nondiscriminatory reason, i.e., attendance points.

Waters responds that she was terminated in part for conduct resulting from her disability, citing Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1139-40 (9th Cir. 2001)("Conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination.") and Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1093 (9th Cir. 2007)(law protects behavior or actions which are the consequences of the disability). Waters points out that she missed three days of work (May 5, May 12, and June 2, 2006) because of her narcolepsy, and that these three absences were counted against her in the termination decision.

Waters was terminated because she accumulated a total of 80 points, including 60 points for the absences in May and June 2006. Fred Meyer has articulated the explanation that the three absences in May and June 2006 were unexcused because Waters did not get her medical certification to Fred Meyer in time to have them excused. However, Waters states in her declaration that her narcolepsy "played a significant role in my inability to provide medical certifications to defendant in March, April, and May 200[6]."

OPINION AND ORDER Page 19

Waters Declaration II. Indeed, the record shows that one of the three absences for narcolepsy occurred during the time she'd been given to get the additional medical information to Fred Meyer. With this evidence, Waters has raised a question of fact on whether her narcolepsy hindered her from timely completion of her medical certification in April and May, 2006, and therefore on the issue of whether her unexcused absences of May 2, May 15, and June 2, 2006 were related to difficulties in obtaining medical certification caused by narcolepsy.

I conclude that Waters has raised a material question of fact for this element of her prima facie case.

### 6. Pretext

Fred Meyer argues that even if Waters has made out a prima facie case, she has not rebutted Fred Meyer's evidence of a nondiscriminatory reason for termination with evidence that the explanation was a pretext for discrimination.

Waters asserts that her evidence of Fred Meyer's failure to respond to her telephone calls of May and June 2006 reporting that she was out sick because of narcolepsy, and of the emails in which it was decided not to remind Waters that these absences would be unexcused because she had not met the deadline for medical certification, is indicative of a discriminatory motive.

Waters argues that "by intentionally covering its corporate eyes and ears," Fred Meyer "found a way to push Ms. Waters closer to termination for excessive absences and placed Ms. Waters on the road to discipline and her ultimate termination." I conclude that

OPINION AND ORDER Page 20

a reasonable jury could infer from the failure to follow up on the telephone calls, and from the emails about whether to remind Waters about the lapsed medical certification deadline and the possible penalties for the absences of May and June, that Fred Meyer intended for Waters to accumulate unexcused absences. When Waters called in on May 5, to say she would miss that day due to her narcolepsy, Fred Meyer made no response. No annual intermittent leave had been approved at that date. When an employee takes unexpected leave under OFLA with no prior notice, the employee must give the employer oral notice within 24 hours. Or. Rev. Stat. § 659A.165(3). The phone call arguably sufficed. The employee also must provide written notice within three days of returning to work. Id. The employer may require an explanation of the need for leave. Or. Rev. Stat. § 659A.165(1) and medical certification. Or. Rev. Stat. § 659A.168(1). The record does not reveal any effort to ask for an explanation of the May 5 need for leave, or for medical certification, or any written follow up by Waters.

I conclude that a reasonable jury could find the proffered explanation by Fred Meyer was pretextual. Genuine issues of material fact preclude summary judgment for Fred Meyer on the disability discrimination claim.

B. Failure to accommodate

Waters also asserts a claim under the ADA and state disability law for failure to accommodate her disability.

The ADA's regulations provide:

(1) The term reasonable accommodation means:

*   *   *

(ii) Modifications or adjustments to the work
environment, or to the manner or circumstances
under which the position held or desired is
customarily performed, that enable a qualified
individual with a disability to perform the
essential functions of that position; or

(iii) Modifications or adjustments that enable a
covered entity's employee with a disability to
enjoy equal benefits and privileges of employment
as are enjoyed by its other similarly situated
employees without disabilities.

(2) Reasonable accommodation may include but is not
limited to:

*   *   *

(ii) Job restructuring; part-time or modified work
schedules; reassignment to a vacant position;
acquisition or modifications of equipment or
devices; appropriate adjustment or modifications of
examinations, training materials, or policies; the
provision of qualified readers or interpreters; and
other similar accommodations for individuals with
disabilities.

29 C.F.R. § 1630.2(o) (emphasis added); 42 U.S.C. § 12111(9)(B).

The employee bears the burden of proving the existence of specific

reasonable accommodations that the employer failed to provide.

Memmer v. Marin County Courts, 169 F.3d 630, 633-34 (9th Cir. 1999).

Waters argues that Fred Meyer's assessment of points against

her for the three absences in May and June 2006 constituted a

failure to accommodate. Fred Meyer makes two arguments against this

claim. The first is that Waters had the same access to protected

leave as similarly situated employees without her disability; thus,

Waters had no need for accommodation in the form of different rules

or waivers of rules governing protected leave and discipline for

OPINION AND ORDER Page 22

unexcused absences. The second is that even when a duty to accommodate exists, employers are not required to grant leaves of absence for sporadic and unpredictable absences when regular attendance is an essential function of the job.

On the first issue, Fred Meyer cites the definition of "reasonable accommodation" in ADA regulations:

> The reasonable accommodation that is required by this part should provide the qualified individual with a disability with <u>an equal employment opportunity. Equal employment opportunity means an opportunity to attain the same level of performance, or to enjoy the same level of benefits and privileges of employment as are available to the average similarly situated employee without a disability</u>.

29 C.F.R. Part 1630 Appx. § 1630.9 (emphasis added).

Fred Meyer argues that an accommodation is intended to provide a qualified disabled employee with the means to perform the essential functions of her position or to enjoy the same benefits and privileges of employment as non-disabled employees. Further, Fred Meyer asserts, an accommodation allowing Waters random and unpredictable absences is not, as a matter of law, a reasonable accommodation, because an employee who must be allowed frequent unscheduled absences is not "otherwise qualified" for most jobs. Fred Meyer cites an unpublished opinion from the Sixth Circuit, <u>Hibbler v. Reg'l Med. Ctr. at Memphis</u>, 12 Fed. Appx. 336, 339 (6th Cir. 2001)(holding that an employer was not required to overlook or accommodate frequent unscheduled and unapproved absences by plaintiff because an employee who cannot meet the attendance requirements of the job cannot be considered a qualified individual

OPINION AND ORDER Page 23

protected by the ADA) and an unpublished opinion from the Tenth Circuit, <u>Keoughan v. Delta Airlines</u>, 113 F.3d 1246 (10th Cir. 1997)(employer not required to accommodate employee by increasing the number of times she could miss work without being disciplined because the requested accommodation precluded the employee from performing an essential function of the position, i.e., showing up for work on a regular and predictable basis).

Waters counters that under Ninth Circuit authority, <u>Humphrey</u>, 239 F.3d at 1135, n. 11, "[r]egular and predictable attendance is not per se an essential job function of all jobs."

Waters also challenges Fred Meyer's argument that the accommodation Waters sought was permission to be absent at "sporadic and unpredictable times." Waters argues that the only accommodation she sought from Fred Meyer was waiving the points assessed against her for the three absences in May and June. She asserts that if Fred Meyer had simply accommodated those three absences by not disciplining her for them, Waters would not have been terminated.

Waters's evidence that Fred Meyer knew for a substantial period of time that Waters had narcolepsy, failed to follow up on her telephone calls saying she was absent because of narcolepsy, and considered and rejected the possibility of reminding her of the deadline generates an issue of fact on whether Fred Meyer could reasonably have accommodated Waters by waiving the points accumulated for the May and June 2006 absences.

////

OPINION AND ORDER Page 24

C.   Failure to engage in interactive process

Waters asserts that Fred Meyer failed to engage in the interactive process with her in connection with her application for intermittent family leave, which Waters requested retroactively back to "5/06" but which Fred Meyer commenced on June 8, 2006, the date it received the second certification from Dr. Bowman. Fred Meyer counters that Waters has failed to demonstrate any need for accommodation, because Waters was able to access family leave in the same manner as every other employee; in the absence of any need for accommodation in the process of obtaining leave, Fred Meyer had no duty to interact with her about it.

For the reasons discussed above, I conclude that the evidence in the record creates issues of fact that preclude summary judgment on this claim. A jury could reasonably conclude that an inquiry by Fred Meyer after the May and June 2006 absences for narcolepsy was a called-for step by the employer in an interactive process.

D.   Retaliation

Title V of the ADA prohibits retaliation against or interference with a person who has asserted rights under the ADA. See 42 U.S.C. §§ 12203(a) & (b). In Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1121 (9th Cir. 2000)(en banc), *vacated on other grounds,* 535 U.S. 391 (2002), the court adopted the framework used to analyze retaliation claims under Title VII of the Civil Rights Act for ADA retaliation claims. Thus, in order to establish a prima facie case of retaliation under the ADA, plaintiff must show 1) she engaged in a protected activity; 2) she suffered an adverse

OPINION AND ORDER Page 25

employment decision; and 3) there was a causal link between the protected activity and the adverse decision. See also <u>Brown v. City of Tucson</u>, 336 F.3d 1181, 1187 (9th Cir. 2003).

If the plaintiff makes out a prima facie case of retaliation, the familiar <u>McDonnell Douglas</u> burden shifting analysis applies: employer must articulate a nondiscriminatory reason and the employee must produce evidence that the explanation is pretextual. <u>Brown</u>, 336 F.3d at 1186; <u>Coons</u>, 383 F.3d at 87.

Fred Meyer moves against Waters's ADA retaliation claim on the ground that she has not produced evidence of pretext. Because I have concluded that Waters has generated an issue of fact on pretext, Fred Meyer's motion for summary judgment on this claim is denied.

E.   Wrongful discharge

Fred Meyer asserts that Waters's wrongful discharge claim stands or falls with her FMLA/OFLA claims, since this claim is predicated on her showing of violations of FMLA and OFLA. Waters does not dispute this characterization of the wrongful discharge claim. I turn, therefore to the FMLA and OFLA claims.

F. FMLA and OFLA

OFLA is "construed to the extent possible in a manner that is consistent with" FMLA. Or. Rev. Stat. § 659A.186(2). Neither party has directed the court to any differences, for purposes of this case, between the federal and state statutes, so a single analysis of both claims suffices.

1.   Was Fred Meyer required to approve Waters for

OPINION AND ORDER Page 26

intermittent leave on April 24, 2006?

For this claim, Waters has alleged as follows:

> Between April, 2006 and June 7, 2006, Ms. Waters missed work on three occasions which, had defendant properly approved her intermittent OFLA/FMLA leave in April, 2006, would have been protected by OFLA/FMLA leave. Defendant charged unexcused absences to Ms. Waters for these three missed days.

Complaint ¶ 17.

Waters asserts that Dr. Bowman's first medical certification, submitted with her April 24, 2006 application, was adequate, and that Fred Meyer violated FMLA/OFLA by requesting additional medical certification on April 26, 2006. She argues that FMLA regulations do not require disclosure of a diagnosis; therefore, Fred Meyer's practice of asking for a diagnosis in medical certifications was illegal.

I disagree with Waters that Dr. Bowman's statement on the April 6, 2006 certification was adequate under FMLA regulations. It says only that Waters has a "chronic medical condition requiring intermittent time off work and medical monitoring and testing." Taylor Declaration, Exhibit F. This statement is devoid of any "medical facts" to support the certification.

Section 825.306 of the FMLA regulations states that the Department of Labor has developed Form WH 380, for use in obtaining medical certification, and reflecting medical certification requirements under FMLA. 29 C.F.R. § 825.306(a). Form WH 380, or another form contgaining the same basic information, may be used by the employer, but no "additional information" may be required. Id.

OPINION AND ORDER Page 27

at (b). The required entries include an explanation of which part of the definition of "serious health condition," if any, applies to the patient and "the medical facts which support the certification, including a brief statement as to how the medical facts meet the criteria of the definition." Id. at (b)(1).

Form WH 380 states as follows:

> Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories.

Smith Declaration, Exhibit N. Fred Meyer's request for medical certification form for health care providers contains identical language: "Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories." See, e.g., Taylor Declaration, Exhibit B. Waters argues that requiring a diagnosis is prohibited "additional information," so that Fred Meyer violated FMLA by asking for a diagnosis.

The term "medical facts which support your certification" does not specifically require or prohibit a diagnosis. Nor does the prohibition on "additional facts" reveal whether a diagnosis would be considered a "medical fact" or an "additional fact." In resolving this problem, the court is guided by amendments to the regulations which took effect in January 2009. The amendments include additional detail about what constitutes "medical facts," and specifically includes diagnosis. The amended regulation provides that the employer may require the employee to obtain a

OPINION AND ORDER Page 28

medical certification that contains the following information:

> A statement or description of appropriate medical facts regarding the patient's health condition for which FMLA leave is requested. The medical facts must be sufficient to support the need for leave. Such medical facts <u>may include information on symptoms, diagnosis, hospitalization, doctor visits, whether medication has been prescribed, any referrals for evaluation or treatment ... or any other regimen of continuing treatment</u>.

29 C.F.R. § 825.306(a)(3)(2009)(emphasis added). The amendment indicates that the Department of Labor construes a diagnosis as a "medical fact" and not as a prohibited "additional fact." The court defers to the agency's interpretation of the regulation and concludes that a diagnosis is a "medical fact" and not an "additional fact." See, e.g., <u>Firebaugh Canal v. United States</u>, 203 F.3d 568, 573 (9th Cir. 2000)(agency interpretation accorded judicial deference unless arbitrary, capricious, or contrary to statute). Accordingly, I conclude that Dr. Bowman's April 6, 2006 certification, submitted on April 24, 2006 by Waters, was inadequate and that it was not a violation of FMLA for Fred Meyer to request medical facts, including a diagnosis.

Waters also asserts that Fred Meyer knew, from Waters's telephone calls on May 5, 2006, May 15, 2006, and June 2, 2006, that she required leave because of her narcolepsy, and therefore that Fred Meyer's refusal to give her medical leave on those dates was a violation of FMLA and OFLA. She argues that Fred Meyer had long been aware that she suffered from narcolepsy and had no reason to believe that her medical condition had changed or improved since April 2005, when Dr. Bowman wrote that Waters had "narcolepsy,

OPINION AND ORDER Page 29

extreme fatigue, headache, nausea" and Fred Meyer granted her a year of intermittent leave. Waters relies on the series of email exchanges within Fred Meyer, indicating that Swan, Waters's supervisor, Jack Pedro, Boomhaver, and Lettenmeier were aware that Waters had applied for another year of intermittent leave in April 2006, and that they assumed it was for narcolepsy. Declaration of Kerry Smith (Smith III), Exhibit A.

Fred Meyer responds that FMLA regulations 1) entitled Fred Meyer to request the "medical facts" missing from Dr. Bowman's certification of April 24, 2006 (29 C.F.R. § 825.306); 2) gave Fred Meyer the right to request such certification at the time Waters gave notice of the need for leave or within two business days after, and Fred Meyer complied with this regulation by requesting the certification on April 26, 2006, two days after Waters's April 24, 2006 application (id. at § 825.305); 3) required Waters to provide certification within the time frame requested by the employer, so long as that time frame was at least 15 days after the employer's request, if the need for leave was foreseeable, or as "soon as reasonably possible under the particular facts and circumstances" if it was not foreseeable (id. at 825.311);[5] and 4)

---

[5] When the leave is foreseeable and at least 30 days notice has been provided, **the employee should provide the medical certification before the leave begins. When this is not possible, the employee must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request)** unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.

OPINION AND ORDER Page 30

authorized Fred Meyer to delay the leave "until the required certification is provided." (id. at § 825.311).[6]

---

> In most cases, the employer should request that an employee furnish certification **at the time the employee gives notice of the need for leave or within two business days thereafter, or, in the case of unforeseen leave, within two business days after the leave commences**. ***

Id. at (b), (c)(emphasis added).

[6] (a) In the case of foreseeable leave, an employer may delay the taking of FMLA leave to an employee who fails to provide timely certification after being requested by the employer to furnish such certification (i.e., within 15 calendar days, if practicable) until the required certification is provided.

(b) When the need for leave is not foreseeable ... an employee must provide certification ... within the time frame requested by the employer (which must allow at least 15 days after the employer's request) or as soon as reasonably under the particular facts and circumstances. ... If an employee fails to provide a medical certification within a reasonable time under the pertinent circumstances, the employer may delay the continuation of FMLA leave.

See also section 825.312(b) ("If an employee fails to provide in a timely manner a requested medical certification to substantiate the need for FMLA leave due to a serious health condition, an employer may delay continuation of FMLA leave until an employee submits the certificate) and Washington v. Fort James Operations Co., 110 F. Supp.2d 1325, 1331 (D. Or. 2000):

> Washington further contends that Fort James may never deny FMLA leave as long as the employee ultimately presents it with proper certification. *** This court does not agree with Washington's interpretation of the regulations. Washington's interpretation of 29 C.F.R. § 825.311(b) would render meaningless that section's requirement that an employee provide certification to his employer within the time frame requested unless particular facts and circumstances justify a delay. The requirement that an employee return his FMLA certification within a reasonable time or else lose his entitlement to FMLA fulfills Congress's desire to

OPINION AND ORDER Page 31

Fred Meyer points out that it also complied with the requirement of section 825.305(d) that, at the time the employer requests certification, the employer "must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification." Taylor's note to Waters on April 26, 2006, warned Waters that her certificate from Dr. Bowman was not sufficient because it did not provide the necessary medical facts, and gave her until May 11, 2006, to provide another one "or we will delay the commencement of your leave until the certification is submitted."

The FMLA regulations do not require employers to accept, without medical verification, the employee's representations about the medical basis for the leave, or to make assumptions, based on past experience, about the "medical facts" supporting the leave. In fact, the regulations specifically authorize the employer to require medical certification "issued by the *health care provider of the employee*," not from the employee. 29 C.F.R. § 825.305(a)(emphasis added). I disagree, therefore, with Waters's argument that Fred Meyer was required to accept the April 24 application without medical facts.

However, a reasonable jury could conclude that when Waters

balance the demands of the workplace with the needs of families. *** Accordingly, the court concludes that an employer may deny FMLA leave where the employee has failed to timely submit the required certification unless timely submission was not reasonably possible under the employee's particular facts and circumstances.

OPINION AND ORDER Page 32

called in on May 5, 2006, and again on May 15, 2006--after the May 11, 2006 deadline had expired-- Fred Meyer had some obligation to treat the telephone calls in May as requests for discrete instances of FMLA or OFLA leave, since leave under the April 24, 2006 application was not yet approved.

> 2. Did Fred Meyer violate FMLA by assessing points against Waters for the absences in May and June 2006?

As discussed, Waters asserts that Fred Meyer violated FMLA when it determined that her leave commenced on June 7, 2006, instead of permitting the leave to commence on "5/06" as Waters wrote in her application for leave dated June 8, 2006. Accordingly, she argues, Fred Meyer should not have imposed points on her for the May 5, May 15, and June 2, 2006 absences.

Fred Meyer asserts that it acted consistently with FMLA regulations when it limited Waters's intermittent leave to the period beginning June 7, 2006; accordingly, the assessment of points against Waters for the May and June 2006 absences was proper. Fred Meyer points out that 1) the first certification from Dr. Bowman was deficient under the regulations; 2) Fred Meyer promptly notified Waters that Bowman's certification was deficient and gave her an opportunity to cure the deficiency within the time mandated by the regulations, see 29 C.F.R. § 825.305(c); and 3) Fred Meyer explained in the response that the consequence of missing the May 11, 2006 deadline would be delaying Waters's leave under 29 C.F.R. § 825.305(d).

OPINION AND ORDER Page 33

1

2      For the reasons already discussed, I conclude genuine issues

3  of material fact preclude summary judgment for either Waters or

4  Fred Meyer on this claim.

5      3.    FMLA retaliation claim

6      Waters concedes the FMLA and OFLA retaliation claims, and

7  withdraws them.

8      H.    Waters's motion for summary judgment on Fred Meyer's
             Tenth Affirmative Defense

9      Waters moves for summary judgment on Fred Meyer's 10th

10 affirmative defense, which is that accommodating Waters's

11 disability would have created an undue hardship for Fred Meyer.

12 Waters asserts that Fred Meyer cannot demonstrate that granting

13 Waters leave for the three absences in May and June 2006 without

14 assessing points under the attendance policy would have created an

15 undue hardship. The existence of factual issues on reasonable

16 accommodation precludes summary judgment in Waters's favor on this

17 affirmative defense.

18                          **Conclusion**

19     Fred Meyer's motion for summary judgment in its favor on all

20 claims (doc. # 20) is DENIED except for those claims conceded by

21 Waters. Waters's motion for partial summary judgment on the

22 ///

23 ///

24 ///

25 ///

26 ///

27

28 OPINION AND ORDER Page 34

FMLA/OFLA claims and on Fred Meyer's Tenth Affirmative Defense is

(doc. # 24) is DENIED.

    IT IS SO ORDERED.

    Dated this __26th_____ day of _June_, 2009.

                                /s/ Dennis J. Hubel

                                _____

                                Dennis James Hubel
                                United States Magistrate Judge

OPINION AND ORDER Page 35